Danny G. LAVENDER Plaintiff,

v.

Robert LAMPERT, et al., Defendants.

No. CIV.00–1398 HA.

United States District Court,
D. Oregon.

Sept. 30, 2002.

Danny G. Lavender, Ontario, OR, Pro se.

Hardy Myers, Attorney General, Lynne D. Rennick, Assistant Attorney General, Leonard W. Williamson, Assistant Attorney General, Oregon Department of Justice, Salem, OR, for Defendants.

## OPINION AND ORDER

HAGGERTY, Chief Judge.

Plaintiff, an inmate at Snake River Correctional Institution, ("SRCI") brings this civil rights action pursuant to 42 U.S.C. § 1983, alleging that defendants violated the Eighth and Fourteenth Amendments by demonstrating deliberate indifference to plaintiff's serious medical needs, thereby causing him pain, physical injury, emotional distress, and permanent disability. (*See* Am. Compl. (# 7) at 2–5, 8.) Currently before the court is defendants' Motion for Summary Judgment (# 29), which, for the reasons set forth below, is granted as to defendant K. Ryals, and denied as to the remaining defendants.

### SUMMARY OF CLAIMS

Plaintiff has been in the custody of the Oregon Department of Corrections ("ODOC") since April 15, 1999. On August 25, 1981, prior to his incarceration, plaintiff suffered a gunshot wound that resulted in a chronic medical condition (partial spastic paralysis) which causes his right foot to flex and curl his toes into a claw. (Am. Compl. at 1.) Defendants contend that surgery and custom orthopedic shoes cannot cure plaintiff's condition, but plaintiff alleges that defendants are deliberately indifferent to managing and treating the chronic pain associated with this medical condition, and that defendants have been deliberately indifferent to the pain and injury caused by delays in providing medically necessary orthopedic footwear.

Plaintiff alleges many other incidents related to defendants' failure to respond to his medical conditions: that various defendants have refused to give plaintiff prescribed medications; that various defendants have refused to treat plaintiff during medical emergencies; and that various de-

fendants have unnecessarily delayed or refused to implement treating physicians' orders. Finally, plaintiff alleges that, as a result of defendants' actions, he suffers unnecessarily from pain in his right foot, legs, and back; that his right foot has been damaged further and the skin on his toes rubbed painfully raw from being forced to walk without appropriate orthopedic footwear; that he has suffered emotional distress and anxiety; and that his disability has been exacerbated by defendants' failures to treat him so that he cannot engage in, or is limited in, his normal daily activities, such as walking and performing his work.

Plaintiff requests equitable relief in the form of a transfer from SCRI to another ODOC institution, and medical care to correct the problems with his foot. Plaintiff also requests money damages in the amount of $20 million, including compensatory and punitive damages, costs and post-judgment interest.

By Order dated April 13, 2001, this court found that plaintiff's amended complaint failed to state a claim against defendants Cook, Wambaugh, Bills, Bonner, and Nugent, and dismissed these defendants from the current action. (Order (# 8) at 3–4.) The court's April 13, 2001, Order also dismissed plaintiff's claims brought under the Americans with Disabilities Act, Rehabilitation Act, Oregon's Racketeer and Corrupt Organizations Act, and various state

criminal statutes. *Id.* Therefore, the only claim remaining in this action is plaintiff's § 1983 claim, in which plaintiff alleges that defendants Duncan, Folkman, Posey, Weavert (Beaver),[1] Wick, L. Ryals, K. Ryals, and Lampert ("remaining defendants") violated the Eighth and Fourteenth Amendments by deliberately ignoring and failing to treat plaintiff's serious medical conditions.

## SUMMARY OF FACTS

### I. Treatment of Chronic Pain

Plaintiff's ODOC medical records indicate that, beginning on March 11, 1999, he complained of chronic pain to medical staff at the Coos County Jail.[2] (Defs.' Motion for Summ. J. (# 29) at Ex. 101, Aff. of Diana Wambaugh, ANP (hereafter "Wambaugh Aff."), Attach. 1, p. 5.) On that date, plaintiff stated that he had been using Tylenol to control his pain, even though Tylenol was not very helpful, so medical staff at the jail prescribed 400 mg of Motrin[3] to be taken on an "as needed" basis for pain relief. (*Id.*) The Motrin prescription appears to have been continued until May 9, 1999, after plaintiff's April 27, 1999, transfer to SRCI. (*Id.* at Attach. 1, pp. 2–6.)

On April 28, 1999, plaintiff first visited sick call at SRCI, where he requested, but apparently did not receive, Motrin for pain in his leg. (*Id.* at Attach. 1, p. 31.) Instead, the nurse wrote a referral to the medical clinic practitioner, who examined

---

**1.** There is some confusion as to whether this defendant is Ms. Weavert, (*see* Am. Comp. (# 7) at 1, 4), or Debora Beaver. (*See* Defs.' Mem. in Supp. of Summ. J. (# 30) at 2.)

**2.** "Chronic pain refers to pain that persists after an injury heals, ... pain related to a persistent or degenerative disease, and long-term pain from an unidentifiable cause." *The Gale Encyclopedia of Medicine,* Vol. 4, 2142 (Donna Olendorf, et al. eds.1999). "[N]euro-pathy, or nerve damage, is included in the chronic category." *Id.* at 2145.

**3.** Motrin tablets contain ibuprofen, which is a nonsteroidal anti-inflammatory drug ("NSAID"), and is indicated for "relief of mild to moderate pain." *Physicians' Desk Reference* 2002–03 (56th ed.2002). Motrin is contraindicated "in patients with previously demonstrated hypersensitivity to ibuprofen, or in individuals with a history of allergic manifestations to aspirin or other NSAIDS." *Id.* at 2003. The *Physicians' Desk Reference* is a recognized authority in the medical profession and consistently followed by physicians in prescribing medications.

plaintiff on May 5, 1999, for his complaint of right knee pain and his request to renew the Motrin prescription. (*Id.* at p. 2, ¶ 5 & n. 4.) The practitioner, Ms. Wambaugh, prescribed Percogesic, an aspirin-free pain reliever, to be taken twice a day for six months as needed, and assigned plaintiff to a bottom bunk for one year. (*Id.* at p. 2, ¶ 6 & Attach. 1, pp. 17, 31.) The Percogesic apparently was effective at relieving plaintiff's pain, since he did not seek additional medical treatment for twenty-two days.

On May 27, 1999, plaintiff complained to the sick call nurse of increased pain in his knee from exercising, and said that he was in pain up to his lower back. (Wambaugh Aff. at Attach. 1, p. 32.) Again, the record does not indicate that he received any immediate treatment for his pain; instead, the nurse referred him to the medical clinic, where he was examined by Ms. Wambaugh on June 1, 1999. (*Id.*) On that visit, Ms. Wambaugh decided to discontinue the prescription for Percogesic, and change the prescription to 800 mg of Motrin, to be taken three times a day for six months as needed. (*Id.* at p. 3, ¶ 6 & Attach. 1, p. 17.)

Plaintiff apparently experienced adverse effects from the increased dose of Motrin, and reported to the sick call nurse on June 3, 1999, that he was afraid take it because of his allergy to Naprosyn, which, like Motrin, is an NSAID.[4] (*Id.* at p. 32.) Plaintiff also reported on that date that he needed pain medication at night for cramps in his right leg, and on this occasion the nurse responded immediately by calling Dr. J.L. Stoune, who is apparently a staff physician at SRCI, and who approved changing plaintiff's prescription to try 325 mg of Quinine Sulfate to be taken once per day. (*Id.* at pp. 17, 32, 68.) At a follow-up visit with Dr. Stoune on June 9, 1999, at which plaintiff continued to complain of right leg pain, Dr. Stoune prescribed additional medication, 300 mg of Neurontin,[5] to be taken three times per day. (Wambaugh Aff. at Attach. 1, pp. 18, 33.)

On June 11, 1999, plaintiff visited sick call with continuing complaints about the condition of his right leg, and was referred to defendant Dr. Ian Duncan, who examined plaintiff for complaints of right knee pain on June 17th. (*Id.* at p. 33–4). At that time, Dr. Duncan recommended an orthopedic consultation for plaintiff's underlying injury, continued the prescription for Neurontin, and prescribed 975 mg of acetaminophen (Tylenol) to be taken as needed for pain. Plaintiff's medications did not effectively alleviate his pain, because he complained at sick call on June 27, 1999, that his leg pain had increased; and, although his duty was lightened to assign him to housing, he did not receive additional pain relievers. (*Id.* at p. 34.) In response to plaintiff's complaints of pain, at a follow-up examination on June 28, 1999, Dr. Duncan prescribed a two-week trial of Flexaril,[6] to be taken three

---

**4.** Plaintiff's initial ODOC medical screening, performed on April 15, 1999, indicated that is allergic to aspirin, penicillin, Darvocet, Naprosyn, and Keflex. (Wambaugh Aff. at Attach. 1, p. 3.) Ms. Wambaugh defends her decision to prescribe Motion for plaintiff, stating that, "[p]ain medications, like Tylenol or Percogesic, treat symptoms of pain but do not reduce inflammation of the soft tissue. NSAIDs are the preferred treatment for chronic pain as described by Mr. Lavender because they are an effective pain medication." (Wambaugh Aff. at p. 3, ¶ 10.)

**5.** Neurontin tablets or capsules contain gabapentin, which is an anticonvulsant "indicated as adjunctive therapy in the treatment of partial seizures." *Physicians' Desk Reference* 2655–56 (56th ed.2002).

**6.** Flexaril tablets contain cyclobenzene hydrochloride, which "relieves skeletal muscle spasm of local origin; ... [but] is ineffective in muscle spasm due to central nervous system disease." *Physicians' Desk Reference* 2094 (56th ed.2002). The drug is indicated for "acute, painful musculoskeletal conditions

times per day as needed to alleviate muscle spasms. (*Id.* at pp. 18, 34.)

On July 8, 1999, Dr. Gary L. Bills, an orthopedic specialist, examined plaintiff, and "found that plaintiff had a right sided spastic hemiparesis—an incomplete paralysis which resulted in plaintiff's foot inverting to the point that he walked uncomfortably on the side of it and recommended a surgical release of the tendons." (Defs.' Concise Stmt. of Mat. Facts at p. 3, ¶ 7.) Dr. Bills did not, however, directly address plaintiff's chronic pain management issues, and on July 12, 1999, plaintiff again appeared at sick call complaining of lower back and right leg pain, and requesting a renewal of his Flexaril prescription, which expired that day. (Wambaugh Aff. at Attach. 1, pp. 18–19, 35.) While the nurse scheduled plaintiff for a visit to the clinic to renew his medication, plaintiff did not receive any additional pain medication until July 16, 1999, when Dr. Duncan renewed his Flexaril prescription for a two-month period. (*Id.* at pp. 19, 35).

However, plaintiff's medications ceased to be effective at controlling his pain, because on July 28th and 30th, and again on August 4th, plaintiff appeared at sick call with complaints of leg and back pain; and on each occasion he was told that he had a future appointment to see a health care provider, and he did not receive any additional medication for pain. (*Id.* at pp. 35–7.) On August 5, 1999, plaintiff was examined by Ms. Wambaugh, and although he requested stronger, narcotic, pain relievers, she "did not believe that Mr. Lavender needed narcotic pain medication for a 15–year–old deformity," and did not authorize a change in his current medications. (*Id.* at p. 4, ¶ 13 & Attach. 1, p. 37.) Plaintiff appeared at sick call the next day, complaining of continued pain, and stating that, "[t]he doctor I saw yesterday didn't do nothing. This hurts." (*Id.* at Attach. 1,

p. 37.) He was not given any additional pain relievers on this occasion.

On August 31, 1999, Dr. Bills performed a tendon release surgery on plaintiff in an effort to return his foot to a better anatomical position. (Defs.' Concise Stmt. of Mat. Facts at p. 3, ¶ 9.) Thereafter, plaintiff was given a 3–day prescription for Vicodin, which he was authorized to take every four hours as needed for post-operative pain; but on September 3rd, plaintiff complained that, while the Vicodin helped the pain in his foot, it did not adequately control the pain for more than one or two hours. (Wambaugh Aff. at Attach. 1, pp. 20, 38–9.) Regardless, Dr. Stoune and Dr. Bills did not continue the prescription for Vicodin on that date; however, the infirmary nurse initially sought approval to continue giving plaintiff Vicodin for pain every six hours on September 4th, and after plaintiff complained of continuing severe pain, the prescription was renewed to allow plaintiff to have Vicodin every four hours for three additional days. (*Id.* at pp. 21, 40, 45.) On September 5th, the record indicates that plaintiff had effective pain relief with Vicodin and Tylenol; (*id.* at p. 45) and, while he complained that he wasn't receiving enough pain medication on September 9th, plaintiff nevertheless began to try to cut back on his pain medication by alternating Vicodin and Tylenol on September 11th. (*Id.* at p. 49, 51.)

On September 16, 1999, plaintiff was examined by Dr. Stoune, who informed him that the prescription for Vicodin would not be renewed, and changed his pain medication to Darvocet. (*Id.* at pp. 52–4.) The record indicates that plaintiff had a "poor attitude" and argued with Dr. Stoune about the medication change because his "pain was severe and Vicodin didn't cover it," and also because he was allergic to Darvocet. (Wambaugh Aff. at

... [and] should be used only for short periods (up to two or three weeks)." *Id.*

Attach. 1, pp. 53–4.) Nevertheless, the nurse gave plaintiff Darvocet shortly thereafter, as Dr. Stone ordered, and although plaintiff did not have an adverse reaction, on September 17, 1999, Dr. Stoune changed plaintiff's pain medication to Tylenol III, to be taken as needed every six hours for an additional three days. (*Id.* at pp. 25, 55.) The combination of Tylenol III with supplemental plain Tylenol successfully managed plaintiff's pain until September 21st, at which point the Tylenol III was discontinued and plaintiff complained at sick call that he was waking up with pain at night. (*Id.* at 57.) On that occasion, he was advised by the nurse to use plain Tylenol for pain. (*Id.*) During a September 28th, consultation with Dr. Duncan, plaintiff was again advised to use plain Tylenol for pain relief, and although he was not given additional pain medication, Dr. Duncan gave him a two-week trial of Flexaril. (*Id.* at pp. 27, 57.) During a post-surgery follow-up appointment on September 30, 1999, Dr. Bills examined plaintiff and concurred with Dr. Duncan's recommendation for analgesia. (Wambaugh Aff. at Attach. 1, p. 57.)

The medical records indicate that plaintiff did not complain of problems with pain until his October 14, 1999, post-surgery follow-up appointment with Dr. Bills; while the doctor's notes do not indicate that he discussed pain management with plaintiff, Dr. Bills did prescribe Ultram[7] twice a day for pain for four weeks. (*Id.* at pp. 28, 59.) On October 15th, plaintiff appeared at the SRCI emergency ward, stating that, "I can't stand the pain. I've gone four days now without anything." (*Id.* at p. 59.) Medication records show that plaintiff's prescription for Tylenol expired on October 11th, and his first dose of Ultram was not issued until October 15th.

(*Id.* at pp. 74, 59.) On October 25, 1999, plaintiff indicated that his medications were effective at controlling his pain at present; however, he expressed concern that he was not receiving adequate long-term pain control and physical therapy for his condition. (*Id.* at p. 60.)

On November 11, 1999, Dr. Bills re-examined plaintiff to evaluate him for an AFO brace, and noted that plaintiff's toes were beginning to claw, but made no mention of pain management. (Wambaugh Aff. at Attach. 1, p. 61.) On November 15th, plaintiff appeared at sick call requesting that his prescription for Ultram be renewed, and was referred to a health care provider, without being issued any additional pain medication. (*Id.*) On November 18th, plaintiff appeared at the emergency ward complaining of severe pain in his ankle and right leg and again requesting Ultram, which had been effective, for the pain. (*Id.* at pp. 61–2.) The nurse stated that she could only give him Tylenol. (*Id.* at p. 62.) On November 19th, Dr. Duncan examined plaintiff, declined to renew the prescription for Ultram, and advised plaintiff to use Tylenol to control his pain. (*Id.*) On November 21st, plaintiff again appeared in the emergency ward, complaining that Tylenol was ineffective at controlling the chronic pain in his right leg. (Wambaugh Aff. at Attach. 1, p. 63.) Finally, on November 22, 1999, eight days after plaintiff first complained of ineffective pain relief, Dr. Duncan re-examined him and renewed plaintiff's prescription for Ultram for one month. (*Id.* at pp. 29, 63.)

On December 2, 1999, Ms. Wambaugh examined plaintiff, and renewed his prescription for Neurontin, as plaintiff requested, since it was effective for reducing

---

**7.** Ultram tablets contain tramadol hydrochloride, a centrally acting analgesic "indicated for the management of moderate to moderate-ly severe pain." *Physicians' Desk Reference* 2600–01 (56th ed.2002).

his pain. (*Id.* at pp. 29, 63.) Plaintiff did not complain of pain again until December 20, 1999, when he visited sick call for pain and stiffness in his right leg. (*Id.* at p. 64.) Plaintiff was not given any additional pain medication during this visit, but was scheduled for a follow-up appointment with Dr. Duncan on December 22, 1999. (*Id.*) Although the record does not indicate that they discussed pain management issues, Dr. Duncan renewed plaintiff's prescription for Ultram for another month. (Wambaugh Aff. at Attach. 1, pp. 30, 65.) On December 23, 1999, plaintiff was brought to the emergency ward by wheelchair because his back and leg pain was so severe that he was unable to walk, and he had not received Ultram for two days. (*Id.* at p. 65.) On that occasion, the nurse called Dr. Duncan, who approved an additional prescription for Vicodin, to be given once a day for five days. (*Id.* at pp. 30, 65.) On December 27th, plaintiff complained of continuing back and leg pain to the sick call nurse, defendant Wick, who rescheduled plaintiff's appointment with Dr. Duncan for an earlier date, but did not give plaintiff any additional pain relievers. (Bills Aff. at Attach. 1, p. 36.) Plaintiff sent a written inmate communication to Dr. Duncan on December 28th, stating that, "I'm hurting real bad ... I'm wondering when I'll be able to see you on meds for pain as I'm off mine today and my altrums [sic] [Ultrams] aren't renewed." (Pl.'s Resp. to Aff. of Ian Duncan, at Attach. 3, p. 23.) The response from a staff member was, "You need to go to sick call." (*Id.*)

On December 29, 1999, plaintiff requested that he be added to the sick call list for back pain, but did not appear, and as a result was placed in the Disciplinary Segregation Unit ("DSU"). (Bills Aff. at Attach. 1, p. 36.) Plaintiff continued to complain of back pain on that date, and while in the DSU requested to be seen in sick call; a request that was denied. (*Id.*)

Plaintiff's medical records indicate that Dr. Bills issued on order to discontinue pain medication for plaintiff's right foot and ankle on December 30th, while plaintiff was in disciplinary segregation. (Wambaugh Aff. at Attach. 1, p. 30.) On January 1, 2000, plaintiff complained to DSU staff of back pain and asked to see a doctor immediately; he was not given pain medication, and was told that he would only see a doctor for a future, previously scheduled, visit. (Bills Aff. at Attach. 1, p. 36–7.)

Plaintiff was released from the DSU on January 4, 2000, and asked to be assigned a wheelchair because his back pain prevented him from walking. (*Id.* at p. 37.) He was allowed to use a wheelchair to return to his cell on that date. (*Id.*) On January 5th, plaintiff appeared at sick call complaining that his back pain was so severe that it prevented him from walking, and he requested the use of a wheelchair. (*Id.*) He was not given any pain medication, and was only authorized to use a wheelchair to get to the clinic for an appointment on the following day. Plaintiff submitted an affidavit from his cellmate, who attests that, "on or about 1–11–00 ... [Mr. Lavender] was unable to sleep and was barely getting to chow or medline, do [sic] to his limited movement from pain in his leg and foot." (Pl.'s Resp. to Aff. of Ian Duncan (# 41), at Attach. 3, p. 119.)

Plaintiff's medical records indicate that he was not examined by Dr. Stoune, as scheduled, and on January 13, 2000, he appeared in the emergency ward complaining of numbness and a pinched nerve that prevented him from walking, but he was not given any pain medication. (Bills Aff. at Attach. 1, p. 38.) Plaintiff's cellmate attests that, "I witnessed Mr. Lavender overdose on medication trying to relieve his pain." (Pl.'s Resp. to Aff. of Ian Duncan, at Attach. 3, p. 119.) On January 14,

2000, after suffering from sixteen days of pain with no relief, plaintiff apparently attempted suicide by intentionally ingesting an overdose of Neurontin, after which all of his medications were suspended, and he was no longer permitted to have them in his cell. (*Id.* at pp. 38–45 & Defs.' Motion for Summ. J. (# 29) at Ex. 105, Aff. of Ian Duncan, D.O. (hereafter "Duncan Aff."), Attach. 2, p. 108.)

While still being treated for the Neurontin overdose in the SRCI infirmary on January 15, 2000, plaintiff complained of continuing numbness and pain, but was offered only Tylenol, which he refused. (Bills Aff. at Attach. 1, pp. 45–6.) Plaintiff continued to request pain medication on that date, until Dr. Duncan wrote a prescription for Percogesic in the afternoon, to be given as needed once a day for five days. (Duncan Aff. at Attach. 2, pp. 46, 108.) On January 19th, plaintiff's medical progress notes indicate that Dr. Bills stated that plaintiff no longer needed pain medications, and all pain meds were to be discontinued. (Bills Aff. at Attach. 1, p. 47.) Plaintiff appeared at sick call on January 20, 2000; he was upset and asking to see a doctor about continuing his pain medication, since Dr. Bills discontinued it without having examined plaintiff since November of 1999. (*Id.* & Defs.' Concise Stmt. of Mat. Facts at p. 4, ¶ 10.) On that occasion, plaintiff was informed by the nurse that he was scheduled to see Dr. Duncan on January 24th, and that he could send a "kyte" (inmate communication) to Mr. Lanny Ryals, the SRCI Health Ser-

vices Manager, to express his dissatisfaction with his medical care, but plaintiff was not given any pain medication. (Bills Aff. at Attach. 1, p. 47.) During the January 24th, visit with Dr. Duncan, plaintiff requested narcotic pain medication to allow him to function more effectively, and Dr. Duncan declined to prescribe such medication, offering the alternatives of non-narcotic medication, different footwear, orthoses, or possible additional surgery; all of which plaintiff declined at the time. (Duncan Aff. at p. 5, ¶ 16.)

The entry was not dated, but later, at sick call, plaintiff complained of back pain, and stated that he had refused the anti-inflammatory medication offered by Dr. Duncan because he was concerned about his ulcers and his liver, that Ultram had worked, and that he needed some pain medication. (*Id.* at Attach. 1, p. 48.) Plaintiff was scheduled to see Dr. Duncan, but was not given any pain medication on this occasion. (*Id.*) At the follow-up visit to Dr. Duncan on February 2, 2000, plaintiff complained of continuing pain, and Dr. Duncan decided to prescribe Feldene,[8] to be taken once a day for three months. (*Id.* at pp. 48, 109.) The defendants' medical progress notes appear to be missing some pages,[9] because plaintiff had an adverse reaction to the Feldene, as evidenced by Dr. Duncan ordering that it be discontinued on February 8th, and substituting Percogesic to be taken three times per day as needed for pain for two months, together with Flexaril nightly for muscle spasms for one month. (*Id.* at p. 109.) While this

---

**8.** Feldene contains piroxicam, which is an NSAID with analgesic properties, and which is indicated for long-term use to relieve forms of arthritis. *Physicians' Desk Reference* 2685 (56th ed.2002). Feldene is contraindicated in "patients who have experienced asthma, ... or allergic-type reactions after taking aspirin or other NSAIDs." *Id.* at 2686.

**9.** Plaintiff included a page from his medical "Progress Notes" which covers the missing entries from February 2, 2000 to February 14, 2000. (Pl.'s Resp. to Aff. of Ian Duncan, at Attach. 3, p. 34.) On February 7th, there is an entry noting that plaintiff appeared at sick call complaining that he was allergic to Feldene, and suffering symptoms of a rash on his neck, swelling of his throat, and increased difficulty breathing. (*Id.*)

combination appears to have alleviated plaintiff's leg and back pain, plaintiff continued to complain of breakthrough pain associated with increasing problems from his hammer toes, and appeared at sick call on February 14th, 16th, and 18th. (Bills Aff. at Attach. 1, p. 49.) On each occasion, he was told that he was scheduled to see a doctor, but was not given additional pain medication.

On March 25th, plaintiff appeared in the emergency ward complaining of increased pain and cramping in his right leg and foot and insisted that he needed additional pain medication. (Duncan Aff. at Attach. 2, pp. 52–3.) Plaintiff's prescription for Flexaril had expired on or about March 8, 2000. (See id. at p. 109.) Although the nurse suggested that plaintiff take additional Tylenol to augment his current pain medication, and tried relaxation techniques, plaintiff indicated that such measures were insufficient. (Id. at p. 53.) On March 27th and 29th, plaintiff appeared at sick call complaining of pain and asking to see a doctor; on neither occasion did he receive additional pain medication. (Id.) On March 31, 2000, plaintiff was examined by Dr. Little, who found that plaintiff was suffering from muscle/nerve spasms, and ordered a prescription for Flexaril for two weeks. (Duncan Aff. at Attach 2., pp. 53, 111.) Plaintiff's cellmate during this period attests that, plaintiff "complains when they refuse him meds and he can't sleep or get around well. Doesn't and can't work, [or] go outside." (Pl.'s Resp. to Aff. of Ian Duncan, at Attach. 3, p. 119.)

Plaintiff's pain relief medication appeared to be effective for two weeks, because he did not complain of pain again until April 14, 2000, when he requested that his prescriptions be renewed to control his back pain. (Duncan Aff. at Attach.

2, p. 55.) On April 19th, during a consultation with Dr. Hartwig, plaintiff stated that Flexaril was not helping his back anymore, so Dr. Hartwig discontinued it and changed plaintiff's prescription to 350 mg. of Soma,[10] to be taken three times a day for one month. (Id. at pp. 55, 112.) Plaintiff did not complain of pain again until April 28th, when he noted that the Soma would wear off in the afternoons, and Dr. Hartwig responded by increasing the dosage in the afternoons for two months. (Id.)

Plaintiff did not complain of pain again until May 29, 2000, when he appeared in the emergency ward in a wheelchair, unable to stand or walk due to back pain. (Id. at p. 57.) The nurse, defendant Folkman, did not give plaintiff any additional pain medication, but did issue him a hot water bottle to ease his discomfort, and authorized the use of a wheelchair for transportation. (Id.) Dr. Hartwig examined plaintiff on June 1, 2000, found that he had strained his back from exercise, and although he did not change plaintiff's pain medications, he authorized the use of a wheelchair for one week. (Duncan Aff. at Attach. 2, pp. 58, 113.) On July 26, 2000, Dr. Hartwig renewed plaintiff's prescription for Soma, two 350 mg tablets to be taken mornings and afternoons as needed, for four months; therefore, plaintiff's Soma prescription was not set to expire until on or about November 26, 2000. (Id. at p. 114.)

Plaintiff did not complain of any pain management issues until September 10, 2000, when he appeared in the emergency ward complaining of back pain and muscle spasms that prevented him from walking more than one or two steps. (Id. at p. 66.) Plaintiff was not given any additional pain

---

**10.** Soma tablets contain carisoprodol, which is indicated "for the relief of discomfort associated with acute, painful musculoskeletal conditions." *Physicians' Desk Reference* 3353 (56th ed.2002).

medication. (*Id.*) On September 8th, Dr. Duncan had rewritten plaintiff's Soma prescription for one 350 mg tablet twice a day, thereby cutting the dosage in half; on September 11th, physician assistant Ishida increased the prescription to its former level for thirty days. (*Id.* pp. 66, 116.) On September 13th, 15th, and 19th, plaintiff complained to his health care providers that, due to Dr. Duncan's actions, his Soma prescription would expire on October 11th, instead of November 22nd, as Dr. Hartwig's original order had specified; plaintiff wanted the order reinstated because the Soma was effective at reducing the pain and muscle spasms in his right leg. (Duncan Aff. at Attach. 2, p. 67.) The Soma prescription was not changed back, and on October 2, 2000, Dr. Duncan again decreased plaintiff's Soma dosage to one tablet, to be taken three times per day, for one month. (*Id.* at pp. 69, 117.)

On October 6, 2000, plaintiff appeared at sick call complaining of pain in his right foot, groin and back; and, although he was not given any additional pain medication, the nurse indicated that she scheduled him to see a health care provider. (*Id.*) On October 9th, plaintiff again visited sick call complaining of the same symptoms, so defendant Wick recommended that plaintiff be sanctioned.[11] (Duncan Aff. at Attach. 2, p. 70.) On October 10th, plaintiff was placed in disciplinary segregation (DSU) for sick call abuse, and his health care provider decreased his Soma dosage from three tablets to two tablets per day while in DSU.[12] (*Id.* at pp. 70, 118.)

On October 18th, plaintiff visited sick call complaining of constant back and hip

pain, and asked to renew his Soma prescription. (*Id.* at p. 70.) Defendant nurse Folkman did not give plaintiff any pain medication; noting only that he was scheduled to see Dr. Bills on November 16th. (*Id.*) On October 23rd, plaintiff met with Dr. Duncan to discuss renewing the Soma prescription; Dr. Duncan wrote in plaintiff's medical progress notes that, "I informed Mr. Lavender that his Soma would be decreased to a single dose, 350 mg. He requested 700 mg. at mid-day rather than in the evening however I explained that the intent was to taper off his use of the medication. At that he became angry and said I was difficult to work with and did not like him." (Duncan Aff. at p. 6, ¶ 22.)

On October 24th, plaintiff complained at sick call of pain in the lower right groin area, and nurse Folkman did not give plaintiff any additional pain medication, but referred him to a health care provider. (*Id.* at Attach. 2, p. 71.) On October 30th, physician assistant Ishida examined plaintiff to rule out a hernia; during the visit, plaintiff asked Mr. Ishida to re-write his Soma prescription, and Mr. Ishida declined to do so. (*Id.*) Plaintiff visited sick call on November 1st, complaining of the same pain, but did not receive any additional pain medication. (*Id.* at p. 72.) On November 14th, during an visit with Dr. Duncan to fit him for boots, plaintiff complained of pain in his right side and Dr. Duncan noted that the tendons in plaintiff's right leg were very tight, so he wrote a prescription to extend plaintiff's Soma prescription at the rate of one 350 mg

---

**11.** Plaintiff sent an inmate communication dated October 15, 2000, to "Ms. Weavert" asking why she ordered him not to come back to sick call on October 4th, and again on October 9th, and complaining that this defendant had "flat refused me medical care." (Pl.'s Resp. to Aff. of Ian Duncan at Attach. 3, p. 59.) Defendant's written response was as

follows: "Your issue of your foot problem has been addressed by the provider." (*Id.*)

**12.** The signature on the order is illegible, but the handwriting appears to be that of physician assistant Ishida, and the medication change was noted by defendant Wick.

tablet, to be taken at noon, for three months. (*Id.* at pp. 73, 119.)

On November 15th, the Therapeutic Level of Care ("TLC") committee ruled to discontinue plaintiff's Soma. (Duncan Aff. at Attach. 2, pp. 73, 119.) Plaintiff complained of continuing leg and back pain at sick call and attempted to renew his Soma on November 20th and 22nd; on November 29th, during a visit with physician assistant Ishida, plaintiff received a prescription for Percogesic, to be taken three times a day for three months. (*Id.* at pp. 73–4, 119.) While plaintiff complained that Percogesic was ineffective at alleviating his pain during a January 2, 2001, visit with Dr. Duncan, the doctor noted that the Soma had been discontinued and did not authorize a change in pain medication. (*Id.* at p. 78.)

On February 5, 2001, plaintiff slipped and fell in the kitchen, and was taken to the emergency ward in a wheelchair, complaining of pain in his right side and back; he was not given any additional pain medication, but was authorized to use a wheelchair for one week. (*Id.* at p. 81.) On February 7th, plaintiff appeared at sick call, complaining that his back pain was so severe that he could not get out of the wheelchair, but he was not given any additional pain medication. (*Id.* at p. 83.) On February 14th, plaintiff continued to complain of back pain, and was still not given any additional pain medication, but was referred to a doctor. (*Id.*) At a follow-up visit with Dr. Duncan on February 16, 2001, plaintiff's prescription for Percogesic was renewed at the same level for three months, and the doctor ordered a two-week trial of Feldene, an NSAID to which plaintiff has a history of adverse reactions, as Dr. Duncan discovered when he prescribed it for plaintiff on February 2, 2000. (Duncan Aff. at Attach. 2, pp. 84, 124; *see also id.* at pp. 48, 109 (allergic reaction to Feldene).)

On February 20, 2001, plaintiff appeared at the emergency ward complaining of severe back pain that increased from walking, since his wheelchair order had expired on February 13th. (*Id.* at p. 84.) Although he was authorized by defendant nurse Beaver (Weavert) to use a "wheelchair taxi" to sick call, until the following day, plaintiff was not given any additional pain medication. (*Id.*) On February 23, 2001, after taking his first dose of Feldene on February 21st, plaintiff complained at sick call that he was again having an adverse reaction to the drug, and it was discontinued. (*Id.* at p. 85.) Plaintiff complained of increased back pain to defendant nurse Wick at sick call on February 28th; while she re-scheduled plaintiff for the next available appointment with a health care provider, she did not give him any additional pain relievers. (*Id.*)

On March 7th at sick call, and again on March 9th, during an examination by Dr. Duncan, plaintiff complained of continuing back pain, and the doctor noted that, "Mr. Lavender continues to experience diffuse discomfort—up & down his spine, into all extremities & his lower abdomen;" however, the defendant did not adjust plaintiff's pain medications, except to prescribe Midrin for headache pain for one month, as plaintiff requested. (*Id.* at pp. 86, 124.) Apparently, Midrin was effective, because plaintiff did not complain of pain at sick call for the remainder of March; he only expressed concerns that the Midrin prescription be renewed. (Duncan Aff. at Attach. 2, pp. 86–88.)

On May 7, 2001, plaintiff visited sick call with complaints of increased headaches, muscle cramps in his back and leg that prevented him from walking in the morning, and chronic pain; although he was scheduled to see a doctor, he did not receive any additional pain medication. During a follow-up visit on May 9th, Dr. Hart-

wig prescribed additional pain medication for one month. (*Id.* at pp. 89–90, 127.) Plaintiff did not complain of pain at sick call, but did report to Dr. Duncan, during an examination on June 27, 2001, that "none of his current medication are useful in controlling his pain." (*Id.* at p. 91.) Regardless, Dr. Duncan did not change plaintiff's prescription for pain medication. (*Id.*) Some pages appear to be missing from plaintiff's medical progress report, because the next entry, dated August 2, 2001, indicates that Dr. Hartwig examined plaintiff for complaints that his pain medication was not working, and prescribed a trial of Doxepin[13] to address plaintiff's chronic pain.

On August 16, 2001, plaintiff was transferred from SRCI to Oregon State Correctional Institution ("OSCI") for a consultation with Dr. Becker. (Defs.' Mot. for Summ. J. (# 29) at Ex. 104, Aff. of Michael Puerini, M.D. (hereafter "Puerini Aff."), Attach. 1, p. 1.) Dr. Becker examined plaintiff on August 21st, and while he recommended a course of treatment for plaintiffs' orthopedic problems, he did not address the issue of plaintiff's chronic pain. (*Id.* at p. 2.) On August 22nd, plaintiff complained to OSCI medical staff that his current medications were not controlling his pain; after examining plaintiff on August 24th, Dr. Puerini elected to "[a]dd Neurontin to chronic pain management given neuropathic symptoms." (*Id.* at pp. 2–3.)

On August 28th, and again on September 6th, plaintiff complained that his pain medications were not working sufficiently, and he was re-examined by Dr. Puerini on September 26th, for pain and neuropathic symptoms related to his right leg. (*Id.* at pp. 3–4.) On that date, Dr. Puerini responded by increasing plaintiff's dose of Neurontin, and reinstating the prescription for Percogesic, to reduce plaintiff's dependency on Midrin. (*Id.* at p. 5.) On October 3, 2001, plaintiff complained that his medications were still ineffective at controlling his pain, and requested additional pain medication; he did not receive any, but was scheduled for a visit with Dr. Becker on October 9th, and with Dr. Puerini on October 12th. (Puerini Aff. at Attach. 1, p. 5.) After examining plaintiff, Dr. Becker recommended a neurology consult to rule out underlying multiple sclerosis or other progressive neuropathic disorder, and the recommendation was forwarded to the TLC committee on October 17, 2001. (*Id.* at 6–7.) During an October 19th consultation with Dr. Puerini, plaintiff stated that Neurontin was helping his pain, and Dr. Puerini renewed his prescription, and reauthorized plaintiff's access to the OSCI therapeutic gym. (*Id.* at p. 7.) On October 26, 2001, plaintiff's medical progress notes indicate that the TLC had not reviewed the Dr. Becker's recommendation for a neurology consult. (*Id.*)

On November 9th, and again on November 16th, plaintiff complained of increasing pain from headaches and hip/back pain on his right side; it appears from plaintiff's medical records that he received additional medication for his pain on the 16th, and was also scheduled for a neurology consultation. (*Id.* at 9–10.) However, on or about November 20, 2001, plaintiff was transferred back to SRCI, before the neurology consultation occurred. (Puerini Aff. at Attach. 1, p. 10.) The final note in plaintiff's records, written on November 26, 2001, reads, "Discussed in TLC—This man needs supervision of medication due to addictive ... behavior." (*Id.*) Plaintiff

---

**13.** Doxepin hydrochloride is a tricyclic psychotherapeutic drug indicated for symptoms of "anxiety, tension, depression, somatic symptoms and concerns, sleep disturbances, guilt, lack of energy, fear, apprehension and worry." *Physicians' Desk Reference* 2713 (56th ed.2002).

was therefore not managed as a neuropathic or chronic pain patient while incarcerated at SRCI.

## II. *Delay in Receipt of Orthopedic Footwear*

Plaintiff has alleged, and his medical records show, that the delays in receiving properly fitted, and medically necessary, orthopedic footwear compelled plaintiff to have to walk on the clawed toes of his right foot, causing pain and damage to the toes from rubbing against his shoes or the ground. (Am. Compl. at 2, ¶ 2.3; *see also* Bills Aff. at Attach. 1, p. 31.) On November 11, 1999, Dr. Bills examined plaintiff to evaluate him for an AFO brace, and noted that plaintiff's toes were beginning to claw. (Bills Aff. at Attach. 1, p. 61.) Plaintiff's next complaint related to his hammer toes occurred during a January 24, 2000, visit with Dr. Duncan, where he complained that they were becoming increasingly painful, but declined to decide whether to pursue the proffered treatment options, which included different footwear, orthoses, or possible additional surgery. (Duncan Aff. at p. 5, ¶ 16.)

At a follow-up visit to Dr. Duncan on February 2, 2000, plaintiff complained of continuing pain from his hammer toes, Dr. Duncan confirmed that plaintiff was having problems with the 3rd, 4th, and 5th toes on his right foot, and he ordered an orthopedic consultation with Dr. Bills.[14] (*Id.* at pp. 48, 109.)

Plaintiff continued to complain of mobility problems and pain from his hammer toes at sick call on February 14th, 16th, and 18th, as well as at his February 22nd consultation with Dr. Bills, at which Dr.

Bills advised plaintiff to continue seeking treatment for an ingrown toenail at the clinic, without directly addressing plaintiff's footwear issues. (Bills Aff. at p. 4, ¶ 13 & Attach. 1, p. 49.)

Plaintiff did not complain about hammer toe problems again until a May 19, 2000, visit with Dr. Hartwig, who recommended a referral to Sawtooth Orthotics to investigate a special shoe to address the clawed toes on plaintiff's right foot. (Duncan Aff. at Attach. 2, pp. 56, 112.) Plaintiff included pages from his medical records showing that Dennis J. Swigart from Sawtooth Orthotics evaluated him regarding his "extreme claw foot" on or about June 30, 2000, and recommended that plaintiff be fitted with an AFO brace and in-depth shoes, writing that, "I feel the orthosis will help him tremendously, not only currently, but long-term to help prevent the progression of his problem." (Pl.'s Resp. to Aff. of Ian Duncan (# 41) at Attach. 3, pp. 97–99.)

On July 14, 2000, plaintiff appeared at sick call complaining of increased pain in his right foot caused by his shoes, and requesting permission to remove the shoe during mealtimes. (Bills Aff. at Attach. 1, p. 59.) The nurse advised plaintiff to wear a shower shoe (thong sandals) and to take off his shoe while in his cell. (*Id.*) On or about July 26th, Dr. Bills examined plaintiff for complaints of muscle spasms and hammer toes, but he did not address the issue of whether an AFO brace or special orthopedic shoes were necessary. (*Id.* at p. 60.) On August 16, 2000, plaintiff's medical progress notes indicate that the TLC committee considered obtaining an AFO brace for plaintiff from Sawtooth Orthotics at a cost of $924.00, but recom-

---

14. Defendants' copies of plaintiff's medical records are missing a page covering the entries from February 2, 2000 to February 14, 2000; however, plaintiff has included a copy showing that Dr. Duncan questioned whether plaintiff's right toes would benefit from surgery on February 2nd, and showing that plaintiff first complained at sick call on February 14th that he couldn't wear his shoes anymore because they made the toes on his right foot bend under. (Pl.'s Resp. to Aff. of Ian Duncan, at Attach. 3, p. 34.)

mended further review by Dr. Bills before approving. (*Id.* at pp. 61, 106.)

On August 21, 2000, plaintiff's wheelchair was confiscated from his cell, because his authorization to use it had apparently expired, but on August 23rd, Dr. Hartwig renewed the order to allow plaintiff to use a wheelchair for long distances for a six-week period, finding that plaintiff was in pain and limping markedly. (*Id.* at pp. 62–3, 115.) On August 28th, plaintiff appeared at sick call complaining that he had not received the wheelchair, as ordered, and was told to call central medical when he needed one because none were available to issue. (Duncan Aff. at Attach. 2, p. 63.) Plaintiff complained on September 4th, and 6th, that he was still having problems with his toes, and had not received a wheelchair. On September 7th, Dr. Bills examined plaintiff for complaints of clawed toes, and ordered that soft, thick-soled shoes were medically necessary, but did not evaluate him for the AFO brace. (*Id.* at pp. 64–5.)

On October 2, 2000, Dr. Duncan examined plaintiff for complaints of pain and hammer toes, and found that he was wearing non-modified work boots that were rubbing the toes. (Duncan Aff. at Attach. 2, p. 69.) On that date, Dr. Duncan ordered that plaintiff be issued medically necessary soft shoes as prescribed by Dr. Bills on Sept. 7th, that he receive modified work boots, and that plaintiff's request to move to a more level housing complex be presented to the TLC committee. (*Id.* at p. 117.) On October 4th, plaintiff appeared at sick call and asked to see a doctor about his foot; defendant nurse Wick denied his request, since plaintiff had been examined by Dr. Duncan two days ago regarding his foot problems. (*Id.* at p. 69.) On October 6th, plaintiff again returned to sick call complaining of pain in his right foot and problems with Complex 3 housing having too many hills. (*Id.*) On

October 9th, plaintiff again visited sick call complaining of the same problems, so nurse Wick recommended that plaintiff be sanctioned, and he was placed in the DSU for sick call abuse on October 10, 2000. (*Id.* at p. 70.)

On November 1, 2000, the TLC committee reviewed Dr. Stoune's September 7th order that soft, thick-soled shoes were medically necessary for plaintiff, and ruled that plaintiff was to be referred to the prison's minimum security "cobbler shop," instead of Sawtooth Orthotics, to obtain the shoes. (Bills Aff. at Attach. 1, pp. 72, 106.) On November 14th, plaintiff met with Dr. Duncan to custom-fit plaintiff's boots. (Duncan Aff. at Attach. 2, pp. 72–3.) On December 1, 2000, plaintiff still had not received his boots, and appeared at sick call complaining of an infection in his right toe and a friction lesion, for which he was given Band-aids. (*Id.* at p. 74.) He returned to sick call for the same issues on December 5th, and complained about the ulcerations on his toes during a visit with Dr. Bills on December 8th. (*Id.*)

On December 13th and 20th, plaintiff complained at sick call that he had not received his orthopedic boots, that he didn't have soft tennis shoes to wear, and that his toe was not healing because of friction abrasions. (*Id.*) He was issued more Band-aids. (*Id.*) On December 22nd, plaintiff was examined by Mr. Ishida, who ordered Betadyne foot soaks for one week to address the infection, and also ordered that plaintiff be given wide tennis shoes. (Duncan Aff. at Attach. 2, pp. 76, 120.) On December 29, 2000, plaintiff was examined by Dr. Hartwig, who noted that plaintiff's toe had developed an ulcerating corn, and that he had still not received his orthopedic boots. (*Id.* at p. 77.) Plaintiff appeared at the central medical unit wearing only a sock on his right foot on December 29th, complaining that he was unable to

walk on his right foot due to increased pain. (*Id.*) Defendant nurse Folkman authorized plaintiff to wear shower shoes, but denied his request to use a wheelchair. (*Id.*)

On January 2, 2001, plaintiff was examined by Dr. Duncan, who noted that plaintiff was continuing to suffer from painful hammer toes, that the tennis shoes only increased the pain, and that plaintiff was therefore wearing only thong sandals because he had not received his orthopedic boots. (*Id.* at p. 78.) Dr. Duncan authorized plaintiff to continue using the sandals for a three-month period. (Duncan Aff. at Attach. 2, pp. 78, 122.) On January 5th, plaintiff appeared at sick call complaining of increased pain from his right toes, because gripping the sandals with his toes was causing muscle cramps in his right leg; he had still not received his orthopedic boots. (*Id.* at p. 78.)

On January 11, 2001, Dr. Bills examined plaintiff, who had received his orthopedic boots the previous day, and found that the boots had not only failed to alleviate plaintiff's hammer toe deformity, they were causing pressure lesions on his right toes. (Bills Aff. at p. 5, ¶ 17 & Attach. 1, p. 79.) Dr. Bills ordered that the boots be modified for a proper fit. (*Id.* at Attach. 1, pp. 79, 122.) On January 17th and 24th, plaintiff appeared at sick call complaining of a large pressure sore on his right foot, and pain from his new orthopedic boots, which were built too small. (*Id.* at p. 80.) Dr. Duncan examined plaintiff on January 26th, and noted that the boots failed to correct his hammer toes, that they were causing pressure lesions on plaintiff's right toes, and that they should be modified by the cobbler shop. (Duncan Aff. at Attach. 2, pp. 80, 122.)

On February 2, 2001, plaintiff still had not received his modified orthopedic boots, and expressed concern at sick call that the thong sandals were inadequate for the slippery winter conditions at SRCI; the nurse directed him to try wearing XXX wide shoes. (*Id.* at p. 81.) On February 5th, plaintiff slipped and fell in the kitchen, injuring his right side and back. (*Id.*) On February 9th, plaintiff received his modified orthopedic boots, but they were still too narrow and were causing pressure sores on his right toes. (*Id.* at p. 83.) On February 16th, Dr. Duncan examined plaintiff, noted that his boots still did not fit properly, and instructed plaintiff to pursue modifications to them "through institutional channels." (*Id.* at p. 84.)

On April 25, 2001, plaintiff requested a second opinion from his providers regarding the course of treatment for the orthopedic problems in his right leg; the sick call nurse noted that the TLC committee had approved an evaluation for an AFO brace on August 16, 2000, but that it had not been conducted. (Duncan Aff. at Attach. 2, p. 88.) The medical progress notes indicate that plaintiff did not complain of additional injury to his toes until June 11, 2001, when he appeared at sick call for friction sores on his right toes, for which the nursing staff was ordered to provide Band-aids. (*Id.* at p. 91.) Dr. Duncan noted that the injury was continuing during his examination on June 27th, and referred plaintiff's orthopedic issues to the TLC committee for guidance. (*Id.*)

On July 5th and 11th, plaintiff complained at sick call that the sores on his toes were increasing in severity, stating that "it rubs on [my] shoe and it's going to get to the bone . . . I can't wear shoes . . . [and] Band-aids don't help." (*Id.* at p. 92.) On this occasion, the nurse authorized plaintiff to take one week off from work, but instructed him not to return to sick call or the emergency ward for the same health issue. (*Id.* at p. 93.) Plaintiff nevertheless appeared at the emergency ward on July 13th, with the same complaints, and was informed by defendant nurse

Wick that he was not to return to sick call or the emergency ward for the same toe injuries. (Duncan Aff. at Attach. 2, p. 93.) Plaintiff did not receive further medical attention on this occasion. (*Id.*) On July 17, 2001, the TLC committee approved a referral to Dr. Becker, an orthopedic specialist, for a re-evaluation of plaintiff's hammer toe condition. (Defs.' Concise Stmt. of Mat. Facts at p. 5, ¶ 16 & Duncan Aff. at Attach. 2, p. 93.) During an examination on July 18th, Dr. Hartwig confirmed that plaintiff was suffering from extreme hammer toes, and that his pressure injuries were ongoing. (Bills Aff. at Attach. 1, p. 93.)

On August 16, 2001, plaintiff was transferred from SRCI to OSCI for a consultation with Dr. Becker. (*Id.* at p. 93a.) Dr. Becker examined plaintiff on August 21st, and recommended that plaintiff obtain soft leather shoes with an extra-depth toe box to alleviate pain and injury related to his hammer toes. (Puerini Aff. at Attach. 1, p. 2.) On October 19th, after examining plaintiff, Dr. Puerini noted that arrangements had been made to obtain custom orthopedic shoes from Valley Orthopedic, and that plaintiff's right foot showed no inflammation, bruise, callus or blister. (*Id.* at p. 7.)

On November 2, 2001, plaintiff was treated for superficial ulcerations on his toes with moleskin, and on November 14th, plaintiff received new extra-depth orthopedic shoes with a right toe crest pad at a cost of $254.70. (*Id.* at pp. 9, 12–13.) Thus, twenty-one months elapsed from February 14, 2000, the date on which plaintiff first complained that he couldn't wear his shoes due to clawing in his right toes, until he received properly fitted orthopedic shoes.

### DISCUSSION

**I. Summary Judgment Standards**

Under Fed.R.Civ.P. 56(c), summary judgment is authorized if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party shows the absence of an issue of material fact, the non-moving party must go beyond the pleadings and designate specific facts showing a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548. A scintilla of evidence, or evidence that is merely colorable or not significantly probative, does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.,* 865 F.2d 1539, 1542 (9th Cir.), *cert. denied,* 493 U.S. 809, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987). The court must view the inferences drawn from the facts in the light most favorable to the non-moving party. Thus, reasonable doubts about the existence of a factual issue should be resolved against the moving party. *Id.* at 630–31.

**II. Respondeat Superior Liability**

Liability under § 1983 cannot be premised upon the doctrine of respondeat superior. *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 691–94, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir.1989) (citation omitted). Therefore, a "supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Taylor,* 880 F.2d at 1045 (citations omitted).

In this case, defendants Robert Lampert, who is the SRCI Superintendent, and Lanny Ryals, who is the SRCI Health Services Manager, argue that, because plaintiff fails to allege that they were personally involved in the deprivation of plaintiff's constitutional rights, the claims against them should be dismissed as a matter of law. This court disagrees.

Plaintiff specifically alleges that defendant Lampert was notified as to plaintiff's medical needs, and that Lampert, "intentionally and knowingly failed in his legal duty to plaintiff . . . to provide food, clothing, medical care and a safe living place . . . by sanctioning SRCI policies." (Am. Compl. at 5, ¶ 3.7.) Further, plaintiff alleges that defendant Lampert was contacted about medical issues on five specific dates, and that Lampert responded by letter stating that plaintiff was receiving proper care. (*Id.* at 6, ¶ 4.3.)

For example, in an inmate communication dated October 3, 1999, plaintiff wrote to defendant Lampert expressing his concern that he was not receiving proper medical attention, since he had been refused care, and given medication to which he was allergic, that all of his grievances for medical issues were denied, and that, "it's my understanding that I'm being punished." (Pl.'s Resp. to Aff. of Ian Duncan at Attach. 3, p. 81.) Again, in an inmate communication addressed to defendant Lampert on January 2, 2000, plaintiff complained that he was being denied pain medication. (*Id.* at p. 79.) Finally, in a July 14, 2001, letter addressed to Mr. Armenakis, and copied to Mr. Lampert, plaintiff wrote, "Do I have any option but [to] live in pain having to place self in DSU to eat or get my medications? . . . [A]s of 7–13–01[my] toe is raw bleeding." (*Id.* at p. 70.) Because plaintiff has alleged and shown that defendant Lampert knew of the facts underlying the alleged Eighth Amendment violations and failed to act to prevent further violations, plaintiff has sufficiently alleged personal participation. *See Taylor,* 880 F.2d at 1045.

Regarding defendant L. Ryals, plaintiff alleges that, as health services manager, Ryals was "notifide [sic] different times as to medical needs doing nothing to correct problem," and that Ryals lied about plaintiff receiving a brace, proper footwear, and physical therapy. (Am. Compl. at 4, ¶ 2.5.) Plaintiff alleges further that he contacted defendant L. Ryals on three specific dates about medical issues, (*id.* at 6, ¶ 4.3) and was told by defendant L. Ryals that "the problem has been addressed in a proper manner." (*Id.* at 4, ¶ 2.5.)

For example, defendant L. Ryals responded on November 29, 1999, to plaintiff's October 3, 1999, communication to defendant Lampert, writing as follows: "You have received many exams and treatment from Dr. Duncan. All of your medical issues have been addressed." (Pl.'s Resp. to Aff. of Ian Duncan, at Attach. 3, p. 81.) In addition, plaintiff has provided a page from his medical records, signed by Dr. Duncan on October 2, 2000, and directed to Lanny Ryals, requesting orthopedic boots to accommodate plaintiff's hammer toes. (*Id.* at p. 48.) Plaintiff has next offered an inmate communication form dated January 18, 2001, and directed to defendant L. Ryals, in which plaintiff writes that the he couldn't wear the orthopedic boots he received from the cobbler shop because they were too small and didn't fit for medical purposes. (*Id.* a p. 52.) Plaintiff also wrote that, "I'm being force [sic] to walk with sore on toe and in pain do [sic] to improper footwear." (*Id.*) The response from defendant L. Ryals reads as follows: "Contact the cobbler shop or get proper fitting shoes from intake. Health Services does not direct the sizing issues with clothing or shoes." (*Id.*) Finally, on February 27, 2001, plaintiff

sent an inmate communication directed to L. Ryals in which he wrote, "Mr. Duncan and Health Services wish not to use meds [but] I can't get proper shoes for my condition. I've got claw toes..... How much more damage and pain do I have to go threw [sic] before we can settle [this] issue[?]" (*Id.* at p. 101.) Because plaintiff has alleged and demonstrated that defendant Lanny Ryals knew of the alleged Eighth Amendment violations and failed to act to prevent them, plaintiff has sufficiently alleged personal participation. *See Taylor*, 880 F.2d at 1045.

## III. *Qualified Immunity*

### A. *Legal Standard*

■ The defense of "qualified immunity" protects "government officials ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." [15] *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). This rule " 'provides ample protection to all but the plainly incompetent or those who knowingly violate the law.' " *Burns v. Reed*, 500 U.S. 478, 494–95, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

■ The entitlement to qualified immunity "is an immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). As such, "a defendant is entitled to a ruling on qualified immunity 'early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive.' " *Jeffers v. Gomez*, 267 F.3d 895, 909 (9th Cir.2001)

(quoting *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001)).

■ The required first step in a qualified immunity analysis "is to consider the materials submitted in support of, and in opposition to, summary judgment, in order to decide whether a constitutional right would be violated if all facts are viewed in favor of the party opposing summary judgment." *Jeffers*, 267 F.3d at 909 (citing *Saucier*, 121 S.Ct. at 2156). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 121 S.Ct. at 2156.

■ If a constitutional violation could be made out on a favorable view of the submissions before the court, "the next, sequential step is to ask whether the right was clearly established." *Id.* "This inquiry ... must be undertaken in light of the specific context of the case, not as a broad general proposition ...." *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer his conduct was unlawful in the situation he confronted." *Id.* (citing *Wilson v. Layne*, 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)).

■ Finally, if the law governing the state official's conduct was clearly established, the court must inquire whether "a reasonable state official [could] have believed his conduct was lawful[.]" *Jeffers*, 267 F.3d at 910 (citing *Browning v. Vernon*, 44 F.3d 818, 822 (9th Cir.1995)) (citing *Act Up!/Portland v. Bagley*, 988 F.2d 868, 871–72 (9th Cir.1993)). "Although a

15. The affirmative defense of qualified immunity does not extend to claims for declaratory or injunctive relief. *American Fire, Theft & Collision Managers, Inc. v. Gillespie*, 932 F.2d 816, 818 (9th Cir.1991) (citations omitted);

*see also Wood v. Strickland*, 420 U.S. 308, 314 n. 6, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) ("[I]mmunity from damages does not ordinarily bar equitable relief as well.").

defendant's subjective intent is not relevant to the qualified immunity defense, his mental state is relevant where it is an element of the alleged constitutional violation." *Jeffers,* 267 F.3d at 911 (citing *Crawford–El v. Britton,* 523 U.S. 574, 589 n. 11, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998)).

### B. *Analysis*

#### 1. *Violation of a Constitutional Right*

##### a. *Eighth Amendment*

■■■■ Generally, deliberate indifference to a serious medical need presents a cognizable claim for a violation of the Eighth Amendment's prohibition against cruel and unusual punishment. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Toussaint v. McCarthy,* 801 F.2d 1080, 1111 (9th Cir.1986), *cert. denied,* 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987); *McGuckin v. Smith,* 974 F.2d 1050, 1059–60 (9th Cir. 1992) *overruled on other grounds by WMX Tech., Inc. v. Miller,* 104 F.3d 1133, 1136 (9th Cir.1997). According to *Farmer v. Brennan,* 511 U.S. 825, 847, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), "deliberate indifference" to a serious medical need exists "if [the prison official] knows that [the] inmate[ ] face[s] a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." The deliberate indifference standard "is less stringent in cases involving a prisoner's medical needs than in other cases involving harm to incarcerated individuals because 'the State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns.'" *McGuckin,* 974 F.2d at 1060 (quoting *Hudson v. McMillian,* 503 U.S. 1, 6, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)). Specifically, a determination of "deliberate indifference" involves two elements: (1) the seriousness of the prisoner's medical needs; and (2) the nature of the defendant's responses to those needs. *McGuckin,* 974 F.2d at 1059.

■■■■ First, a "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *Id.* (citing *Estelle,* 429 U.S. at 104, 97 S.Ct. 285). Examples of instances where a prisoner has a "serious" need for medical attention include the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain. *Id.* at 1059–1060 (citing *Wood v. Housewright,* 900 F.2d 1332, 1337–41 (9th Cir.1990)); *Hunt v. Dental Dep't,* 865 F.2d 198, 200–01 (9th Cir.1989).

■■■ Second, the nature of a defendant's responses must be such that the defendant purposefully ignores or fails to respond to a prisoner's pain or possible medical need in order for "deliberate indifference" to be established. *McGuckin,* 974 F.2d at 1060. Deliberate indifference may occur when prison officials deny, delay, or intentionally interfere with medical treatment, or may be demonstrated by the way in which prison officials provide medical care. *Id.* at 1059–60.

■■■ In this case defendants do not dispute, and the record clearly demonstrates, that plaintiff has a "serious" medical condition that fits within the *McGuckin* examples: permanent spastic partial paralysis in his right lower extremities, related to a 1981 gunshot wound to the neck, which resulted in a spinal injury that causes him to suffer from an inverted right foot, a clawing deformity of his right toes, and chronic pain. 974 F.2d at 1059–60; (Defs.' Mem. in Supp. of Summ. J. (# 30) at 1, 6). However, defendants contend that there

has been no deliberate indifference, and therefore no Eighth Amendment violation, because they have been responsive to plaintiff's medical needs; "attempting in good faith to ameliorate his symptoms (since they cannot cure the underlying condition), through anti-inflammatory pain relieving and muscle relaxing medication, surgery, special footwear and orthotic devices." (Defs.' Mem. in Supp. of Summ. J. (# 30) at 6.) The voluminous record developed by defendants in support of their motion for summary judgment, reveals that, from April 15, 1999, to November 26, 2001, plaintiff regularly utilized the prison's medical resources, and that while he complained of numerous ailments, his complaints were primarily related to symptoms from his underlying spastic paralysis, including damage to his right foot, and chronic pain. (*See also* Defs.' Concise Stmt. of Mat. Facts (# 31).)

Nevertheless, the record also reveals that plaintiff consistently complained of pain, and frequently complained that such pain was debilitating, and that although he was examined regularly by medical staff, there is an ongoing pattern of ignoring, and failing to timely respond to or effectively manage, plaintiff's chronic pain.[16] In addition, the record reveals that the nature of defendants' responses demonstrates deliberate indifference to the pain and damage to plaintiff's right foot caused by delays in plaintiff's receipt of appropriate, properly fitted, orthopedic footwear. *See* Summary of Facts, *supra* at pp. 834–836, 836, 837–838 (lack of AFO brace, denial of wheelchair, housing assignment in an

area with hills, punishment in DSU for appearing at sick call regarding ongoing injury to toes, refusal to render treatment for toe injuries). Viewing the facts in a light most favorable to plaintiff, it appears from the factual allegations and from the record on summary judgment that Duncan, Folkman, Posey, Weavert (Beaver), Wick, L. Ryals and Lampert, the defendants responsible for providing medical care to plaintiff, have violated the Eighth Amendment by being deliberately indifferent to his serious medical conditions: chronic pain and the need for properly fitting orthopedic footwear. *See Saucier,* 121 S.Ct. at 2156 (citation omitted).

### b. *First Amendment*

■ The allegations regarding defendant Kathy Ryals, who is the SRCI Grievance Coordinator, are different in nature from those involving the other defendants. Since plaintiff has not alleged that Ms. Ryals was deliberately indifferent to his serious medical conditions, he therefore has not stated an Eighth Amendment claim against her. Instead, he "seeks damages against Kathy Ryals [for] not processing medical grievances and discrimination [sic] forms." (Am. Compl. at 4.) Instead, the applicable constitutional provision is that of the First Amendment: prisoners have a constitutional right of access to the courts, which extends to established prison grievance procedures. *See Lewis v. Casey,* 518 U.S. 343, 346, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *Bounds v. Smith,*

16. Plaintiff's medical records show that, from April 15, 1999, to November 26, 2001, the typical pattern of practice in response to plaintiff's complaints of pain was that he would visit the SRCI sick call, be refused additional pain relievers by the sick call nurse, and be referred to a health care provider, who may or may not adjust plaintiff's pain medication to address his complaints of increased pain. *See, e.g.,* Summary of Facts, *supra* at pp. 826–827, 828–829, 831–832. Plaintiff would frequently complain of nearly continuous pain for more than 10 days, and on two occasions for more than 30 days, while he waited for a doctor to prescribe effective pain medication. *See id.* at pp. 831–832, 833.

430 U.S. 817, 821, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *Bradley v. Hall,* 64 F.3d 1276, 1279 (9th Cir.1995); *Valandingham v. Bojorquez,* 866 F.2d 1135, 1138 (9th Cir.1989).

■■■ "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). In determining whether a prison regulation is reasonably related to legitimate penological interests, the court considers (1) whether there is a valid, rational connection between the regulation and a legitimate government objective which operates in a neutral fashion without regard to the content of the expression; (2) whether there are alternative means of exercising the right at issue that remain open to the prisoner; (3) the impact that the accommodation of the asserted constitutional right will have on prison staff and resources; and (4) the absence of ready alternatives that fully accommodate the prisoner's rights at *de minimus* costs to valid penological interests. *Thornburgh v. Abbott,* 490 U.S. 401, 414–419, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989); *Turner,* 482 U.S. at 89–90, 107 S.Ct. 2254; *Mauro v. Arpaio,* 188 F.3d 1054, 1058–59 (9th Cir.1999); *Walker v. Sumner,* 917 F.2d 382, 385(9th. Cir.1990).

■■■ In this case, unlike *Bradley,* plaintiff was not punished as a result of utilizing the SRCI grievance procedures to address his medical care issues. 64 F.3d at 1279. Plaintiff has not alleged or demonstrated that having his grievances returned to him because they were procedurally defective according to the applicable Oregon Administrative Rules, Chapter 291, Division 109, caused any sort of "chilling effect" on his ability to exercise his First Amendment rights. *See, e.g., Hines v. Gomez,* 108 F.3d 265, 269 (9th Cir.1997). Plaintiff has not alleged that the Oregon Administrative

Rules are constitutionally invalid under *Turner,* 482 U.S. at 89–90, 107 S.Ct. 2254.

Defendant Kathy Ryals attests that of the sixteen grievances plaintiff filed about his medical care, ten were returned to him for failure to comply with the rules, and six of them were processed. (Defs.' Motion for Summ. J. (# 29) at Ex. 103, Aff. of Kathleen Ryals at p. 2, ¶ 7.) Similarly, of the three discrimination complaints filed by plaintiff, all were returned, "with the explanation that they did not meet the criteria for a discrimination complaint." (*Id.* at p. 3, ¶ 10.) Even if viewed in a light most favorable to plaintiff, it appears from the factual allegations and the record on summary judgment that defendant Kathy Ryals has not violated plaintiff's constitutional rights; therefore, she is entitled to qualified immunity. *See Saucier,* 121 S.Ct. at 2156 (citation omitted).

2. ***Constitutional Right was Clearly Established***

■■■ The record demonstrates a violation of plaintiff's Eighth Amendment right. Therefore, the court must decide whether the "contours" of the right are " 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Id.* (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). In this particular case, since the controversy arose in 1999, defendants should have been aware of the legal standards for an Eighth Amendment claim for deliberate indifference to a serious medical condition as provided by the lead cases of *Farmer,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811, and *McGuckin,* 974 F.2d 1050, which were, and still are, binding precedent in the Ninth Circuit.

While the record shows that defendants have not been deliberately indifferent to treating plaintiff's underlying partial spas-

tic paralysis and that they have used orthopedic procedures, including surgery, to mitigate the associated problems with his right foot (*see* Defs.' Concise Stmt. of Mat. Facts, at pp. 3–4, ¶¶ 6–7, 9–10 & p. 5, ¶ 16), *McGuckin* is clear that "the existence of chronic and substantial pain" itself demonstrates a "serious" medical need. 974 F.2d at 1060. Any reasonable official would understand that to deny or delay treatment for such pain, or to ignore it, would constitute deliberate indifference to a serious medical condition, and therefore violate the Eighth Amendment prohibition against cruel and unusual punishment.

The remaining defendants, Duncan, Folkman, Posey, Weavert (Beaver), Wick, L. Ryals, and Lampert, have argued only generally that "defendants are entitled to qualified immunity because plaintiff's claim under the Eighth Amendment fails to state a claim," (Defs.'s Mem. in Supp. of Summ. J. (# 30) at 9) and have failed to demonstrate on an individual basis whether each defendant's specific responses to plaintiff's complaints of pain were reasonable under the circumstances which he or she confronted, as required by *Saucier* in order to establish a defense of qualified immunity. 121 S.Ct. at 2156. The record on summary judgment indicates that there is a repeated pattern in SCRI health services of failing to respond to plaintiff's frequent requests for effective treatment of his pain; allowing plaintiff's prescriptions for pain medication to lapse; and arbitrarily cancelling or reducing the level of pain medications provided to plaintiff, particularly while he was housed in disciplinary segregation. *See,* Summary of Facts, *supra* at pp. 826–835. Because defendants, as the moving party, have not met their initial burden to demonstrate that there is an absence of a genuine issue of material fact with respect to the reasonableness of each defendant's conduct towards plaintiff's allegations of deliberate indifference to his chronic pain, summary judgment on

the basis of qualified immunity is inappropriate with respect to plaintiff's Eighth Amendment claim on this issue. *See Adickes v. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *see also Act Up!/Portland v. Bagley,* 988 F.2d 868, 873 (9th Cir.1993)(if there is a genuine dispute as to the "facts and circumstances within an officer's knowledge," or "what the officer and claimant did or failed to do," summary judgment is not appropriate).

 Regarding the delay in providing properly fitting orthopedic footwear, a prisoner cannot make a claim for deliberate indifference to a serious medical condition based merely on delay of treatment, unless the denial of medical attention was harmful, *McGuckin,* 974 F.2d at 1060 (citing *Shapley v. Nevada Bd. of State Prison Comm'rs,* 766 F.2d 404, 407 (9th Cir. 1985)); however, it is not necessary to find that a defendant's actions resulted in "substantial" harm to the prisoner. *Id.* at 1060. In this case plaintiff has alleged, and the record supports, that the delays in receiving properly fitted, and medically necessary, orthopedic footwear forced plaintiff to have to walk on the clawed toes of his right foot beginning on or about January 24, 2000, until he received properly fitted shoes on November 14, 2001, causing pain and lesions on the toes from friction against his shoes or the ground. (Am. Compl. at 2, ¶ 2.3); *see also* Summary of Facts, *supra* at pp. 834–838. Considering the legal precedent in the Ninth Circuit, set forth above, a reasonable official who observed, or who was notified about, plaintiff's injuries sustained from inappropriate footwear, would know that delays or failure to mitigate or prevent further pain and damage to plaintiff's right foot would constitute the "unnecessary and wanton infliction of pain," and would therefore violate a clearly established constitu-

tional right. *Estelle*, 429 U.S. at 104, 97 S.Ct. 285; *see also Farmer*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811; *McGuckin*, 974 F.2d 1050.

Again, with respect to the issue of plaintiff's injuries sustained from the lack of appropriate orthopedic footwear, the remaining defendants have based their qualified immunity argument solely on the contention that plaintiff has failed to state an Eighth Amendment claim; however, this court has determined that plaintiff's constitutional rights were violated. (Defs.'s Mem. in Supp. of Summ. J. at 9.) Defendants have again failed to demonstrate on an individual basis whether the specific responses to plaintiff's complaints of injuries and pain caused by delays in receiving properly fitted orthopedic footwear were reasonable under the circumstances confronted, as required by *Saucier* to establish a defense of qualified immunity. 121 S.Ct. at 2156. Because defendants, as the moving party, have again failed to meet their initial burden to demonstrate that there is no genuine issue of material fact regarding the reasonableness of each defendant's conduct, they have not satisfied this court that they are entitled to summary judgment on the basis of qualified immunity from plaintiff's Eighth Amendment claim on the orthopedic footwear issue. *See Adickes*, 398 U.S. at 157, 90 S.Ct. 1598 (1970); *Act Up!/Portland*, 988 F.2d at 873.

**IV.** ***Merits of Plaintiff's Eighth Amendment Claim***

**A.** ***Legal Standard***

 The Eighth Amendment prohibits cruel and unusual punishment, and "[d]enial of medical attention to prisoners constitutes an [E]ighth [A]mendment violation if the denial amounts to deliberate indifference to serious medical needs of the prisoners." *Toussaint*, 801 F.2d at 1111 (citing *Estelle*, 429 U.S. at 106, 97 S.Ct. 285). Deliberate indifference to a serious medical need exists when a prison official knows that an inmate faces a "substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. 825 at 847, 114 S.Ct. 1970, 128 L.Ed.2d 811. "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974 F.2d at 1059 (quoting *Estelle*, 429 U.S. at 104, 97 S.Ct. 285).[17] A plaintiff need not prove complete failure to treat; deliberate indifference may be shown where access to medical staff is meaningless because the staff ... does not render competent care. *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir.1989)(citing *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir.1982).)

**B.** ***Analysis***

**1.** ***Treatment of Chronic Pain***

 On March 11, 1999, the beginning of his current period of incarceration, plaintiff identified himself as a chronic pain patient, and the record indicates that he continued to re-iterate his need for consistent pain relief thereafter. Summary of Facts, *supra* at pp. 826–835. The record also indicates that, while he had access to medical care in the ODOC system, and was frequently examined by health care providers, they frequently failed to treat his complaints of pain entirely, and often exacerbated his pain by allowing his prescriptions for pain relieving medications to lapse, or by failing to prescribe a pain reliever that was effective in the first place. *Id.* While the record overall demonstrates a failure to develop and imple-

---

**17.** The applicable legal standard is discussed in greater detail at Part II.B, pp. 45–46.

ment a comprehensive plan to treat plaintiff's chronic pain, several incidents are particularly egregious.

Beginning in April of 1999, through trial-and-error, nurse practitioner Wambaugh discovered that Percogesic was effective at relieving plaintiff's pain; nevertheless, she cancelled that prescription less than a month later, and refused to renew it, instead prescribing Motrin, an NSAID to which plaintiff had adverse reactions. *Id.* at pp. 826–827. Other health care providers also refused to renew the Percogesic prescription, although they did try other non-NSAID medications in an effort to relieve plaintiff's pain.

On October 14, 1999, after a subsequent period of trial-and-error during which plaintiff consistently complained that his pain medication was ineffective, Dr. Bills prescribed Ultram, which proved to be relatively effective at controlling plaintiff's pain. *Id.* at pp. 828–829. However, his health care providers repeatedly allowed the Ultram prescription to lapse; on November 19, 1999, defendant Dr. Duncan refused to renew plaintiff's Ultram prescription, after which plaintiff appeared in the emergency ward complaining of severe pain. *Id.* at p. 829. Although Dr. Duncan relented, and prescribed Ultram for plaintiff again on November 22nd, he again allowed it to lapse in December, so that plaintiff spent several days in unnecessary pain. Summary of Facts, *supra* at pp. 829–830. Dr. Duncan did not promptly renew the Ultram prescription when it expired in December, so plaintiff again spent several days in unnecessary pain. *Id.* On December 29th, plaintiff was placed in disciplinary segregation (DSU) for sick call abuse, and Dr. Bills, without examining plaintiff, cancelled all of his pain medication on December 30, 1999; therefore, plaintiff received no prescription pain medication while housed in the DSU. *Id.* This incident not only demonstrates unnecessary and wanton infliction of pain; it appears that the infliction of pain was, by its very nature, punitive.

On January 14, 2000, after being released from the DSU, and yet still suffering continuous pain for sixteen days, plaintiff apparently attempted suicide by overdosing on Neurontin. *Id.* at p. 830. Thereafter, plaintiff was unable to convince his health care providers to renew his Ultram prescription.

On May 19, 2000, after more than three months of additional, and unnecessary, trial-and-error, Dr. Hartwig prescribed Soma for plaintiff, and it was found to be effective for managing plaintiff's pain if two 350 mg. tablets were taken mornings and afternoons. *Id.* at pp. 831–832. Regardless, Dr. Duncan cut plaintiff's dosage in half on September 8, 2000, after which plaintiff suffered debilitating pain and muscle spasms. Summary of Facts, *supra* at p. 832. Although another health care provider increased the Soma dosage to its previous level, on October 2nd, Dr. Duncan again decreased the dosage to one tablet, to be taken three times per day, for one month. *Id.* at pp. 832. On October 10th, after plaintiff repeatedly complained of pain, he was again sanctioned for sick call abuse, and was placed in disciplinary segregation. *Id.* at p. 832. Even though plaintiff's current Soma prescription was not set to expire until November 2nd, his health care providers decreased his Soma dosage from three tablets per day to two while he was housed in the DSU. *Id.* Again, this action goes beyond even the constitutional standard of unnecessary and wanton infliction of pain, and appears to be punitive.

On October 23, 2000, plaintiff's Soma prescription was further reduced to one tablet per day; and on November 14th, after continuing complaints of pain and

requests for more Soma, Dr. Duncan renewed plaintiff's prescription at that level for three months. *Id.* at p. 833. However, the very next day, the TLC committee decided, against Dr. Duncan's order, to discontinue plaintiff's Soma, and despite plaintiff's repeated requests to reinstate the drug due to its effectiveness, it was not prescribed again. *Id.* at pp. 832–833.

Chronic pain is long-term, unrelenting pain, and yet defendants, knowing that plaintiff suffers from such pain, still failed to provide continuous and effective pain-relieving medication. On at least two occasions, plaintiff's pain medication was discontinued or reduced when he was placed in disciplinary segregation, so that he suffered from increased pain. These actions cannot be other than "unnecessary and wanton infliction of pain," the very touchstone of an Eighth Amendment violation. *See Estelle,* 429 U.S. at 104, 97 S.Ct. 285. Because there is a genuine issue of material fact as to the appropriateness of the medical attention plaintiff has received for his chronic pain, defendants' motion for summary judgment is denied.

### 2. *Delay in Receipt of Orthopedic Footwear*

A prisoner cannot make a claim for deliberate indifference to a serious medical condition based merely on delay of treatment, unless the denial of medical attention was harmful, *McGuckin,* 974 F.2d at 1060; *Shapley v. Nevada Bd. of State Prison Comm'rs,* 766 F.2d 404, 407 (9th Cir.1985); however, it is not necessary to find that a defendant's actions resulted in "substantial" harm to the prisoner. *Id.* at 1060. In this case plaintiff has alleged, and the record supports, that the delays in receiving properly fitted, and medically necessary, orthopedic footwear forced plaintiff to have to walk on the clawed toes of his right foot, causing pain and damage to the toes from rubbing against his shoes or on the ground, and that the defendants

were, at various times, deliberately indifferent to his suffering. (Am. Compl. at 2, ¶ 2.3); Summary of Facts, *supra* at pp. 834–838.

Dr. Bills first noticed that the toes on plaintiff's right foot were beginning to claw during an examination on November 11, 1999. (Bills Aff. at Attach. 1, p. 61.) Plaintiff initially complained of pain from the condition of his toes on January 24, 2000. (*Id.* at pp. 47–8.) Plaintiff's first complaint that he could no longer wear his shoes due to the pain from his toes occurred on February 14, 2000. (Pl.'s Resp. to Aff. of Ian Duncan, at Attach. 3, p. 34.) From that date, twenty-one months elapsed before plaintiff received properly fitted orthopedic shoes that did not cause pain and further injury to his hammer toes. (*See* Puerini Aff. at Attach. 1, pp. 9, 12–13 (showing that plaintiff received his orthopedic shoes on November 14, 2001).)

During that twenty-one month period, the defendants, particularly Dr. Duncan, responded to plaintiff's footwear dilemma by examining him regularly, and noting that his wearing of ill-fitting boots, or medically inappropriate thong sandals, was causing pain and further injury to his hammer toes. Summary of Facts, *supra* at pp. 835–837. However, the record is also clear that there were unnecessary delays in providing plaintiff with proper orthopedic footwear. For example, even though Dr. Duncan ordered an orthopedic consultation for plaintiff's footwear issues on February 2, 2000, when the orthopedic specialist, Dr. Bills, examined plaintiff on February 22, 2000, he failed to recommend or authorize orthopedic shoes. *Id.* at 835. Such unnecessary delay in the face of plaintiff's suffering constitutes deliberate indifference. *See Hunt v. Dental Dep't,* 865 F.2d 198, 200–01 (9th Cir.1989)(where prisoner alleged that a three-month delay in replacing dentures was causing pain, this was sufficient to state a claim of deliberate

indifference to serious medical needs); *see also McGuckin*, 974 F.2d at 1059–60.

Again, on or about June 30, 2000, plaintiff was evaluated for orthopedic footwear by Sawtooth Orthotics, whose representative recommended an AFO Brace and extra-depth shoes, but it wasn't until September 7, 2000, that Dr. Bills authorized soft, thick-soled shoes. Summary of Facts, *supra* at pp. 835–836. The TLC committee did not review and approve Dr. Bills' order for orthopedic shoes until November 1, 2000. *Id.* at 836. Plaintiff did not receive his first pair of orthopedic boots until January 10, 2001, and these exacerbated the injury to his toes because they did not fit properly. *Id.* at 837. Again, such delays in providing plaintiff with appropriate footwear, while he continues to suffer pain and injury, constitutes deliberate indifference.

■■■ During the period from June of 2000 to January of 2001—a delay in excess of six months—the pain and injury to plaintiff's foot became so severe that he needed a wheelchair for mobility. *Id.* at 835–837. From January through August of 2001, and particularly in July of 2001, the record indicates that plaintiff continued to go without properly fitting orthopedic footwear, and that his pain and injuries became increasingly severe; however, he apparently was not authorized to use a wheelchair. *Id.* at 837–838. There is an issue of fact as to whether a wheelchair was timely provided and whether plaintiff was allowed to use it until his footwear problem was resolved. To unnecessarily

deny the use of a wheelchair to someone who obviously has an injury, and who lacks mobility without it, would constitute deliberate indifference to a serious medical need.[18] *See McGuckin*, 974 F.2d at 1059–60.

Additionally, in October of 2000, plaintiff was apparently assigned to housing Complex 3, which has hilly terrain that further increased his orthopedic problems; the record is not clear as to the dates on which he was assigned to Complex 3, or reassigned elsewhere. Summary of Facts, *supra* at p. 835. From October 2nd to October 9th, plaintiff complained so frequently to his healthcare providers about the injury to his foot, that he was refused treatment and placed in disciplinary segregation on October 10, 2000, for sick call abuse.[19] *Id.* at pp. 835–836. Therefore, issues of fact exist as to the appropriateness of this housing assignment, and whether delays in re-assigning plaintiff exacerbated the damage and pain in his claw toes, as he has alleged; as well as to whether defendants' refusal to treat him was appropriate: to knowingly allow plaintiff to suffer unnecessarily would constitute an Eighth Amendment violation. (Am. Compl. at 1.); *see also McGuckin*, 974 F.2d at 1059–60.

Because there are genuine issues of material fact as to the appropriateness of the medical attention plaintiff has received, and as to the defendants' responsiveness to plaintiff's complaints of pain and injury caused by the delays in receiving properly fitted orthopedic footwear, defendants' motion for summary judgment is denied.[20]

---

**18.** In particular, plaintiff alleges that defendants Folkman and Duncan refused him use of a wheelchair. (Am. Compl. at 3–4.)

**19.** In particular, plaintiff alleges that defendants Weavert (Beaver) and Wick refused him medical attention. (Am. Compl. at 4.) Further, plaintiff alleges that he intended to get placed in the DSU to get out of Complex 3. (*Id.* at p. 1.)

**20.** Plaintiff filed a motion for injunctive relief on January 22, 2002, alleging that, while his orthopedic shoes are effective at alleviating the pain and injury to his hammer toes, the sole of the right shoe rubs off to the point where it needs to be repaired approximately every six weeks, leaving him without appropriate orthopedic footwear. (Plaintiff's Motion for Injunction (# 38) at Lavender Aff., p.

## CONCLUSION

Based on the foregoing, IT IS ORDERED that defendants' Motion for Summary Judgment (# 29) is GRANTED IN PART, with respect to defendant Kathy Ryals, who shall be dismissed from this action; and DENIED IN PART, with respect to the remaining defendants, Ian Duncan, Irene Folkman, Cathleen Posey, Debora Beaver (Weavert), Jackie Wick, Lanny Ryals, and Robert Lampert.

IT IS SO ORDERED.

2.) This injury is part of an ongoing pattern, as the court found in its June 13, 2002, Opinion and Order (# 61), in which the court granted a preliminary injunction in plaintiff's favor, and directed defendants to obtain a second pair of custom made orthopedic shoes so that plaintiff does not go without his medically necessary footwear when and while a pair is being repaired.